GISKAN SOLOTAROFF & ANDERSON LLP
90 Broad Street, 10th Floor
New York, New York 10004
(646) 964-9640
Jason L. Solotaroff
Amy E. Robinson
*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X

JONATHAN OLIVER,

                      Plaintiff,                    **COMPLAINT**

       -against-                       Dkt. No.

ARMY WEST POINT ATHLETIC ASSOCIATION,

                      Defendant.

-----------------------------------------------------------------------X

       Plaintiff Jonathan Oliver, Ph.D., by his attorneys Giskan Solotaroff & Anderson LLP, for his complaint against Defendant Army West Point Athletic Association, alleges as follows:

## PRELIMINARY STATEMENT

       1.      This is an action, brought pursuant to the diversity jurisdiction of the Court, for unlawful retaliation in violation of N.Y. Labor Law § 740, N.Y. Not-For-Profit Corporation Law § 715-b(a), N.Y. Executive Law §296(7) and for breach of the covenant of good faith and fair dealing.

       2.      Dr. Oliver, a knowledgeable and experienced sports science professional in college athletics and professional sports, was hired in March 2019 as Senior Associate Athletic Director for High Performance by Army West Point Athletic Association ("AWPAA"), a non-

profit entity that administers intercollegiate sports at the United States Military Academy ("USMA"), also known as West Point or Army.

3.      During the interview process for the newly created position, Dr. Oliver was told that there were deficiencies in the care and training that West Point provided to its cadet-athletes and that the position had been created to remedy these deficiencies and elevate West Point's program in these areas.

4.      Upon assuming the Associate Athletic Director position, however, Dr. Oliver was prevented from exercising management and oversight over West Point's athletic program and ensuring its compliance with New York State, AWPAA, and National Collegiate Athletic Association ("NCAA") regulations. The main problem concerned two long-time members of the West Point athletics staff, Head Athletic Trainer Tim Kelly and Director of Olympic Sports Scott Swanson. Mr. Kelly and Mr. Swanson were largely to blame for the deficiencies and non-compliance. Although they reported to Dr. Oliver, they refused to cooperate with Dr. Oliver and resisted Dr. Oliver's efforts to bring the program into compliance.

5.       When Dr. Oliver attempted to discipline Mr. Kelly and improve his performance, Kelly sought protection from the most powerful and highest paid member of West Point's athletic staff, Head Football Coach Jeff Monken. Coach Monken ensured that Mr. Kelly would not be disciplined or forced to improve his performance and retaliated against Dr. Oliver by barring him from West Point's main athletic facility.

6.      Dr. Oliver continued to try to do his job and improve the inadequate training and care that West Point's cadet-athletes were receiving in general and ensure compliance with New York State AWPAA and NCAA regulations and policies. In addition, after discovering that West

Point's female cadet-athletes were receiving inferior training and care compared to male cadet-athletes, Dr. Oliver insisted that AWPAA improve the services provided female cadet-athletes.

7.    In January 2020, however, West Point's new Athletic Director, who was hired after Dr. Oliver and who was unable or unwilling to protect West Point's cadet-athletes, terminated Dr. Oliver's employment in retaliation for Dr. Oliver's efforts to protect the cadet-athletes and prevent discrimination. The termination also breached the covenant of good faith and fair dealing embodied in Dr. Oliver's employment agreement.

8.    As a result of Dr. Oliver's termination, he has lost compensation in excess of $300,000.

## THE PARTIES

9.    Dr. Oliver is domiciled in McGregor, Texas.

10.    Defendant Army West Point Athletic Association is a not-for-profit corporation organized under the laws of New York with its principal place of business in West Point, New York.

## VENUE AND JURISDICTION

11.    Based on the diversity of citizenship of the parties, and the amount in controversy exceeding $75,000, this Court has jurisdiction over Dr. Oliver's claims pursuant to 28 U.S.C. § 1332.

12.    Venue is properly before this Court pursuant to 28 U.S.C. § 1391 as a substantial part of the events or omissions giving rise to the claim occurred in this District.

13.    This Court has personal jurisdiction over Defendant because it is established under the laws of New York State and operates its business in New York State.

3

## FACTS

A.  Dr. Oliver's Background.

14.     Dr. Oliver earned his Master of Education in Kinesiology from The University of Texas in 2006, and, thereafter, his Ph.D. in Kinesiology from Texas A&M University.

15.     From 2011 to 2012, Dr. Oliver worked pursuant to a Department of Defense grant at the University of Pittsburgh to improve performance and reduce injury among Navy SEALs.

16.     From 2013 through 2019, Dr. Oliver was employed at Texas Christian University ("TCU") as an Assistant Professor in the Department of Kinesiology and  Director of The Sports Science Center at TCU, which provided a multidisciplinary approach to improving sport performance and athlete health for TCU athletics, local high schools, and professional sporting organizations.

B.  Dr. Oliver is Hired at West Point to Improve Sports Performance and Cadet-Athlete Safety and Well-Being at West Point.

17.     In late 2018, Dr. Oliver applied for the newly created position of Senior Associate Athletic Director for High Performance at West Point. During the interview process, Dr. Oliver met with then-Athletic Director ("AD") Eugene "Boo" Corrigan and, on multiple occasions, with other members of AWPAA senior staff.

18.     During these discussions, Dr. Oliver was told that West Point needed someone with Dr. Oliver's experience in sports science and performance to improve and oversee the way West Point's athletic program trained and cared for its cadet-athletes.

19.     AWPAA senior staff explained that Dr. Oliver's main challenges in improving West Point's athletic training and performance would be the management of two long-time athletic department employees who would be reporting to him: Head Athletic Trainer Tim Kelly,

4

to whom each team's athletic trainer reported, and Director of Olympic Sports Scott Swanson, to whom West Point's strength coaches reported. Dr. Oliver was told that Kelly and Swanson would likely resist any of Dr. Oliver's efforts to change or improve the department.

20.     During the interview process, Dr. Oliver learned of at least one specific area of concern and potential non-compliance with NCAA regulations. West Point's physician, Dr. Chad Haley, and other senior athletics staff told Dr. Oliver that they were concerned about an unprecedented number of non-contact knee injuries sustained by cadet-athletes on Army's women's basketball team during the prior 2018-19 season. Dr. Haley and Dr. Oliver agreed that West Point's Athletic Training department should have performed preventative testing on these cadet-athletes.

21.     Recognizing the challenges he would face, Dr. Oliver accepted the position in January 2019 and began work at West Point on March 1, 2019.

C.  Dr. Oliver Was Responsible for Ensuring West Point's Compliance With New York State, NCAA and AWPAA Rules and Regulations.

22.     Dr. Oliver's contract required him to "perform such duties as are reasonable and customary for the Senior Associate Athletic Director in organizational administration and such other duties and responsibilities usual and customary to the position…" Senior Associate Athletic Director Employment Agreement # 19-01-007, Section 1. It also required him to "[t]o recognize and comply with the laws, policies, rules and regulations of the AWPAA, the USMA, the National Collegiate Athletic Association (the "NCAA") and all applicable conferences." *Id*. at Section (5)(c).  The contract further required Dr. Oliver to:

> Provide[] administrative oversight, support and direction for assigned intercollegiate athletic programs. Work[] closely with coaching staff and team members to serve as program advocate both

> internally and externally. Interface[] with members of coaching staff and players regularly to remain engaged on daily activity, needs and general state of specific program. Act[] in accordance with NCAA, Patriot League, USMA and athletic department policies and rules at all times. Represent[] administration at practices, game competitions and official team functions whenever possible.

*Id*. at Section 6(b).

23.     Finally, the contract required Dr. Oliver to "[w]ork with sports programs and coaches to develop projects that will enhance individual and team athletic performance." *Id*. at Section 6(c).

24.     As referenced in the employment agreement, the Athletics Department at West Point was subject to multiple regulatory systems to which Dr. Oliver, along with other administrators, was responsible for ensuring compliance.

25.      This included the New York State Department of Education's Rules of the Board of Regents, which regulated the conduct of Certified Athletic Trainers including Mr. Kelly and the athletic trainers assigned to each of Army's athletic teams. These regulations, among other things, prohibited health professionals, including Certified Athletic Trainers, from "failing to maintain a record for each patient which accurately reflects the evaluation and treatment of the patient;" 8 NYCRR §29.2(c); prohibited "neglecting a patient or client under and in need of immediate professional care;" 8 NYCRR § 29.2(a)(1); and generally prohibited the "willful or grossly negligent failure to comply with … rules or regulations governing the practice of the profession." 8 NYCRR §29.1(b)(1).

26.     The conduct of Mr. Kelly and the athletic trainers was also regulated by the Board of Certification ("BOC") Standards of Professional Practice for Athletic Trainers. BOC is the only accredited certification program for athletic trainers in the United States. Compliance with the BOC Standards of Professional Practice is mandatory for Certified Athletic Trainers. Those

standards, in the section "Patient Care and Responsibilities," list the following as a basic tenet

for athletic trainers: "Protects the patient from undue harm and acts always in the patient's best

interests and is an advocate for the patient's welfare, including taking appropriate action to

protect patients from healthcare providers or athletic training students who are, impaired or

engaged in illegal or unethical practice." The BOC Standards further require athletic trainers to

report "any suspected or known violation of applicable local, state and/or federal rules,

requirements, regulations and/or laws by him/herself and/or by another Athletic Trainer that is

related to the practice of athletic training."

27.     In addition, the AWPAA has rules and regulations, embodied in the AWPAA

Staff Guide, which regulate the conduct of members of the athletic department including senior

administrators such as the Athletic Director, as well as the coaches and trainers.  These rules

require athletic trainers to focus on injury prevention and record injury information if they do

occur.

28.     Finally, the NCAA has promulgated rules and regulations to which the West Point

Athletic Department is subject.  These include a prohibition on non-professionals conducting

strength training of athletes, such as West Point's cadet-athletes.

D. <u>Dr. Oliver's Authority and Efforts to Improve Cadet-Athlete Safety and Well-Being Are
   Immediately Challenged.</u>

29.     Unfortunately, between the time Dr. Oliver accepted the position and began

working, Mr. Corrigan resigned his position as Army Athletic Director and accepted a position at

North Carolina State University.   Although Mr. Corrigan remained as Athletic Director for a

short time, and promised he would meet with Dr. Oliver, Mr. Kelly, and Mr. Swanson so that Dr.

Oliver's authority would be made clear, that meeting never happened. Shortly thereafter, there

7

was no permanent Athletic Director in place and no one to ensure that Mr. Kelly and Mr. Swanson understood Dr. Oliver's authority.

30.     Instead, from the start of Dr. Oliver's tenure, Mr. Kelly refused to accept Dr. Oliver as his supervisor. Indeed, Mr. Kelly refused even to meet with Dr. Oliver on occasion, which prevented Dr. Oliver from having visibility into the training and strength/conditioning programs for each of Army's sports and access to information concerning cadet-athlete injuries.

31.     Dr. Oliver immediately raised this issue with senior officials in the West Point Athletics Department, including the Interim Athletic Director, Dan McCarthy, and Senior Associate Athletics Director for Human Resources, Jenna McLaughlin. Mr. McCarthy sympathized with Dr. Oliver, sharing that he too had experienced similar issues with Mr. Kelly, including insubordination. Ms. McLaughlin shared similar dissatisfaction, including, but not limited to, poor communication, particularly with female senior staff and coaches, and insubordination.  Ms. McLaughlin communicated that this was why Dr. Oliver was hired: AWPAA senior staff had long felt that there were failures, as previously mentioned, and that Dr. Oliver's knowledge and expertise would be able to identify those deficiencies and create a plan to correct them.  Ms. McLaughlin told Dr. Oliver to keep appropriate records so that when the time came, any action taken against Mr. Kelly would be supported.

32.      The situation with Mr. Kelly did not improve and Dr. Oliver realized that the welfare of cadet-athletes was being endangered.

33.     First, Mr. Kelly failed to maintain adequate oversight of Army's athletic trainers for each sport, specifically failing to require that they maintain complete records of cadet-athlete injuries.

34.     Mr. Kelly's failure to maintain these records was a violation of Rule 29.2(a)(3) of

the N.Y. Rules of the Board of Regents, which prohibits "failing to maintain a record for each

patient which accurately reflects the evaluation and treatment of the patient," and a violation of

Section 12-11 ("Injury Recording") of the AWPAA Staff Guide, which provides:

> All injuries incurred by cadet-athletes participating in their sport
> during traditional and non-traditional seasons will be recorded
> following the Sports Injury Management System (SIMS) computer
> system. Daily records of practices, treatments, and rehabilitation
> will be updated on a daily basis. Yearly injury statistics will be
> reported for each intercollegiate sport.

35.     Mr. Kelly also refused to share data on injuries in prior years with Dr. Oliver,

thereby inhibiting Dr. Oliver's ability to oversee and improve cadet-athlete care. Dr. Oliver

believed that Mr. Kelly's refusal to share information was motivated by his desire to hide his

own poor management and oversight failures.

36.     Throughout the first several months of Dr. Oliver's tenure, and despite multiple

efforts by Dr. Oliver, AWPAA's human resources and AWPAA's counsel took no action to

correct Mr. Kelly's behavior and discipline him. Mr. Kelly was continually insubordinate and

refused to cooperate with Dr. Oliver to protect the safety and well-being of West Point's cadet-

athletes.

37.     Also, in or around March 2019, Dr. Oliver learned that Mr. Swanson was

permitting West Point athletes to be trained at times by a group of cadets known as the "Strength

Team." Dr. Oliver informed Mr. Swanson that the Strength Team could not train athletes without

supervision pursuant to the NCAA bylaws and that a certified strength coach must be present

during athlete training and conditioning.  Mr. Swanson responded that the Strength Team had

been in place for a number of years and was created to deal with the large number of cadet-

athletes that train concurrently and was necessary to meet the recommended guidelines of the National Strength and Conditioning Association.  Dr. Oliver communicated that though he understood, the solution was not in compliance with NCAA bylaws and requested that a work group be established to identify the required number of coaches necessary to adhere to the bylaws and guidelines.  Soon thereafter, additional staff were approved in the form of graduate assistants.  Nevertheless, Mr. Swanson continued to allow the Strength Team to perform duties in violation of the NCAA bylaws and Dr. Oliver's directive.

E.   Dr. Oliver Attempts to Correct Kelly's Behavior.

38.    Believing that he had no other option to safeguard the health and well-being of the cadet-athletes, Dr. Oliver, along with other senior West Point athletics administrators and AWPAA counsel, decided that Mr. Kelly would be placed on a Performance Improvement Plan ("PIP"). The PIP, which became effective August 21, 2019, expressly stated that Mr. Kelly's misconduct was "affecting … cadet-athlete wellbeing." Mr. Kelly had until September 20, 2019, to comply with the PIP or risk termination. The conditions of the PIP included attending mandatory, regular meetings with Dr. Oliver.

39.    The PIP was given to Mr. Kelly in a meeting with Dr. Oliver, new Athletic Director Mike Buddie, and other senior administrators including Senior Associate Athletic Director Kristine Fowler and HR Specialist Taylor Pennings. After the meeting, Mr. Buddie stated that based on separate conversations he had with Mr. Kelly, in which Mr. Kelly communicated that he would "dig in his heels", Mr. Buddie believed Mr. Kelly would continue to refuse to cooperate with Dr. Oliver. Mr. Buddie and other senior administrators stated that it was unlikely Mr. Kelly would remain employed after 30 days based on his conduct prior to and in the meeting.

F.  Coach Monken Retaliates Against Dr. Oliver for His Compliance Efforts Directed at Kelly.

40.     The basis for Mr. Kelly's belief that he could continue to be insubordinate to Dr. Oliver soon became clear. Mr. Kelly turned for protection to Army's head football coach, Jeff Monken, a revered figure at West Point and the highest paid employee at AWPAA and possibly at West Point as a whole.

41.     Soon after Mr. Kelly received the PIP, Mr. Buddie told Dr. Oliver that Coach Monken "hated [Dr. Oliver] right now" and that Coach Monken had barred Dr. Oliver from the Kinsey Athletic Center where Dr. Oliver had his office.

42.     This was extremely problematic. With no access to the Kinsey Center, Dr. Oliver was not able to provide necessary oversight and supervision for cadet-athlete training, and conditioning. As a result, he was not able to ensure compliance with NCAA and other rules and regulations.

43.     Indeed, this action prevented Dr. Oliver from performing the conditions of his employment contract with AWPAA and, as such, constituted a breach of the covenant of good faith and fair dealing implicit in his agreement.

G.  Dr. Oliver Continues to Attempt to Bring West Point's Athletic Department in Compliance – and is Thwarted by Coach Monken.

44.     On October 23, 2019, West Point's Athlete Nutrition Center failed a health inspection that had been requested by Dr. Oliver and conducted by Army's Department of Preventative Medicine and Wellness. The nutrition center had been under the direct supervision of the Director of Olympic Sports, Mr. Swanson, and the strength and conditioning staff who reported to Mr. Swanson. Under the supervision of Mr. Swanson, the Army had been providing athletes non-third-party-certified supplements (including in protein shakes prepared in the

11

nutrition center), which placed cadet-athletes at risk of inadvertently consuming harmful (and potentially illegal) substances. To make matters worse, the nutrition center had never before been subject to the appropriate inspection to ensure compliance with health and safety codes.

45.     In addition, Mr. Kelly prevented Dr. Oliver from having access to West Point's cadet-athlete injury tracking software for the entire duration of his tenure. Without access to the software, Dr. Oliver was unaware of the extremely significant and troubling practice of not inputting injuries into the management system until one of the athletic trainers disclosed it to Dr. Oliver in the Fall of 2019. This was a direct violation AWPAA Staff Guide Sections 12-11. The lack of access also prevented Dr. Oliver from exercising oversight over the injury trends, which had been previously brought to the attention of Dr. Oliver by the physician and other senior administrators, and over post-injury return-to-play processes for cadet-athletes across all sports.

46.     Similarly, at the apparent direction of Coach Monken, the football staff removed Dr. Oliver's access to a software program that Dr. Oliver had implemented for the football team to collect information on the physical stress placed on West Point's football players, further preventing Dr. Oliver's ability to perform his job safeguard the well-being of West Point's cadet-athletes.

47.     Dr. Oliver repeatedly raised his concern about not being able to ensure compliance with Mr. Buddie and Coach Monken's supervisor, Deputy Athletic Director and Football Sports Supervisor McCarthy. Each time, Mr. Oliver was told that, based on "orders" from Coach Monken, Dr. Oliver should make his presence at Kinsey Center scarce and that due to the alliance between Coach Monken and Mr. Kelly, nothing would be done to deal with Mr. Kelly's continued non-compliance and obstruction.

H.  Dr. Oliver Learns About and Attempts to Remedy Athletic Training Failures Involving to the Women's Soccer and Basketball Teams.

48.     Additionally, in December 2019, Dr. Oliver learned of other health and safety failures affecting Army's cadet-athletes on the women's soccer and basketball teams. These issues emphasized Army's systemic failures within sports medicine, all for which Mr. Kelly had oversight.

49.     During a post-season meeting on or about December 13, 2019 between Dr. Oliver, Army's Head Coach for Women's Soccer, Adrian Blewitt, and Mr. Kelly, Dr. Oliver was informed that several players had complained that the team's athletic trainer, Nicole Payne, was not providing adequate medical care, including a failure to diagnose and treat injuries, and that Ms. Payne was dismissive, and even rude, when female cadet-athletes expressed concerns about their care.

50.     According to Coach Blewitt, a particular athlete told him and Mr. Kelly that she had received substandard care from Ms. Payne, which she believed contributed to a back injury. Coach Blewitt had also spoken with the athlete's mother, whom he later described to Dr. Oliver in a December 16, 2019 text message as "irate with how [her daughter] ha[d] been handled."

51.     Ms. Payne's alleged misconduct, and Mr. Kelly's failure to exercise appropriate oversight over Ms. Payne, violated AWPAA policies, the Board of Certification ("BOC") Standards of Professional Practice for Athletic Trainers, and New York law.

52.     According to AWPAA policy:

> the [m]aintenance of health and fitness of the Corps Squad athlete is the primary focus of the Athletic Training Office. The supervision that athletic trainers provide includes responsibilities in such areas as: injury prevention; evaluation and medical referral; first aid and emergency care; rehabilitation and reconditioning; and education

appropriate to the above practices.

Staff Guide at p. 106.

53.     In addition, the BOC Standards further require Athletic Trainers to report "any suspected or known violation of applicable local, state and/or federal rules, requirements, regulations and/or laws by him/herself and/or by another Athletic Trainer that is related to the practice of athletic training."

54.     In addition, the Rules of the New York State Board of Regents applicable to Certified Athletic Trainers, prohibit the "willful or grossly negligent failure to comply with … rules or regulations governing the practice of the profession." 8 NYCRR §29.1(b)(1) and "neglecting a patient or client under and in need of immediate professional care." 8 NYCRR § 29.2(a)(1).

55.     Dr. Oliver took immediate action to investigate the serious allegations of improper care by Ms. Payne. First, Dr. Oliver called a meeting with the entire women's soccer team and coaching staff to provide a platform for the players to voice their concerns in a safe environment. During that meeting, it quickly became clear that the issues and injuries were largely attributable to inadequate care and oversight by Ms. Payne, and, relatedly, by her direct supervisor Mr. Kelly. Dr. Oliver, together with the players and staff, agreed that, pending investigation, Ms. Payne would be permitted to continue working with cadets who were willing to do so, and that those who were not comfortable working with her, including the athlete who had suffered the back injury, would be assigned to another trainer. At the meeting, that athlete appeared eager to start working with a new trainer, a solution that Coach Blewitt fully supported.

56.     Also in December 2019, the Head Coach for Army's women's basketball team, Dave Magarity, told Dr. Oliver about an email that he had received from the mother of a cadet-

athlete, who had suffered a non-contact ACL tear.  That athlete's mother had concerns about her daughter's care and medical treatment at Army. Dr. Oliver spoke with the mother at length on December 12, 2019, and learned that she believed the team's Strength Coach, Keith Meyerson, under the direction of Scott Swanson, had failed to work with her daughter to improve her strength around the knee and prevent the injury.

57.     After the December 12, 2019 meeting with the athlete's mother, Dr. Oliver met with Athletic Trainer Connie Andujar. Dr. Oliver learned that the athlete had scored poorly on the injury risk assessment, which indicated that she was high-risk for a sports injury.

58.     Dr. Oliver then met with Strength Coach Keith Meyerson, who worked with Army's Women's Basketball Team, to review his training program. Dr. Oliver discovered that there had been no attempt to implement an appropriate training plan for the athlete that would have reduced the risk of injury determined by the assessment. In addition, Meyerson's training program in general failed to comport with best practices on injury prevention and monitoring, including principles of progressive overload.

59.     Shortly thereafter, Mr. Oliver asked Mr. Swanson if he had reviewed the programs of the strength coaches who reported to him, including Mr. Meyerson, and whether Mr. Swanson had requested that the appropriate athletic trainer review the programs to see if they included injury prevention protocols. Mr. Swanson admitted that he had not reviewed them, nor had he or Mr. Kelly required strength programs to be reviewed by athletic training staff, even though injury prevention is clearly outlined in AWPAA policies and is listed as Standard 2 of the mandatory BOC Standards of Professional Practice for Athletic Trainers.

60.     It became clear to Dr. Oliver that Mr. Swanson and Mr. Kelly had failed to ensure that injury prevention protocols were standard practice at Army.

I.  Dr. Oliver Again Raises Concerns to Athletic Director Buddie Concerning the Safety and
    Well-Being of Cadet-Athletes, in Particular Female Cadet-Athletes.

61.     In mid-December 2019, Dr. Oliver again reported to Mr. Buddie his concerns

about Army's practices and conduct that threatened the health and safety of cadet-athletes

generally and in particular female cadet-athletes.

62.     Specifically, on December 17, 2019, Dr. Oliver wrote to Mr. Buddie raising

concerns about Mr. Kelly's failures to safeguard the welfare  and also requesting an urgent

meeting to discuss a proposal for the football program which would increase the number of

football training staff, add a physical therapist (a request that had previously been made by

Coach Monken), and would "result in reduced injuries." Dr. Oliver stated, "As I have shared,

Tim [Kelly]'s continued failure to follow the [PIP] has placed the welfare of cadet-athlete[s] at

risk." Dr.  Oliver also made clear that he did not think the Coach Monken's favoritism towards

Mr. Kelly, given Mr. Kelly's miserable and dangerous track record, should operate at the

expense of health and safety of Army's cadet-athletes across sports, with women's sports being

disproportionately affected.

63.     Mr. Buddie's response implied that there was nothing he could do because, as a

perceived "extremely valuable asset to the [football] program," Mr. Kelly was effectively

untouchable.

64.     On December 18, 2019, Dr. Oliver wrote to Mr. Buddie about the "deficiencies in

training" he had discovered on the women's soccer and basketball teams. In the email, Dr. Oliver

implored Mr. Buddie, as Athletic Director, to recognize the magnitude of the systemic problems

affecting Army's cadet-athletes, writing,

        I had  to  meet  with  the  entire  women's  soccer  team  yesterday

concerning an issue related to an athletic trainer. Specifically, in addition to poor communication, there is a lack of confidence from the cadet-athletes in the ability of the athletic trainer to diagnosis and treat injuries. Additionally, I spoke with a cadet-athlete parent from women's basketball following an email to Coach Magarity concerning an injury. She seemed to highlight the events of last year when multiple non-contact injuries were reported in women's basketball, an issue of concern from the coach and executive staff when I arrived. These events further highlight how Tim [Kelly]'s actions and behaviors are directly impacting cadet-athlete welfare. While I respect Coach Monken's opinion of Tim [Kelly]'s value to football, I do not believe his value to one team should come at the expense of others.

65.     Mr. Buddie did nothing in response to Mr. Oliver's email.

66.     On January 7, 2020, Women's Soccer Coach Blewitt contacted Dr. Oliver to follow up about the assignment of a new trainer for the cadet-athlete with the back injury because her "symptoms [were] no better." In response, Dr. Oliver wrote to Mr. Kelly, copying Coach Blewitt, to inquire about the assignment of a new trainer. Mr. Kelly did not respond.

67.     On January 8, 2020, Coach Blewitt forwarded Dr. Oliver a message that he had received from the cadet-athlete asking about the new trainer: "Just got this from [the cadet-athlete]. Maybe this isn't a priority for Tim Kelly[,] but I can totally see why [the cadet-athlete] and her parents are pissed off that nothing gets done quickly. Can you help get this moving with the new trainer please?" Because it was clear that Mr. Kelly refused to do anything to ensure proper care for the cadet-athlete, later that day, Dr. Oliver contacted Army's Head of Physical Therapy, LTC Mike Crowell, to discuss the cadet-athlete and the related athletic training issues and to ensure adequate follow-up.

68.     The next day, January 9, 2020, Dr. Oliver called a meeting with Mr. Kelly, Ms. Fowler, and HR Specialist Ms. Pennings, to discuss putting Athletic Trainer Ms. Payne on a PIP. At that meeting, Dr. Oliver also told Ms. Fowler about the injuries and issues on the women's

basketball team, including his conversations with the cadet-athlete's mother in which she expressed significant concerns about her daughter's care and about the overall treatment and care of Army's cadet-athletes. Despite having oversight for Human Resources, Ms. Fowler claimed that she had no knowledge of the situation, through Mr. Buddie or otherwise.

J. Dr. Oliver Raises Issues Shortly Before His Termination Concerning Compliance Violations Related to the Strength Team.

69. At that same time, Dr. Oliver requested meetings with executive staff to discuss the compliance issues concerning West Point's "Strength Team." Dr. Oliver had directed that the Strength Team's practice of providing strength training without professional supervision was not permitted. However, given his "banishment" from the Kinsey Center, Dr. Oliver had not been able to determine whether his directive was being followed there, though he was aware that it was not being followed in the other strength training area for West Point's cadet-athletes.

70. According to Mr. Swanson, it was West Point's position that cadets on the Strength Team were "interns" and thus exempt from the NCAA rule. After conferring with compliance in December 2018, however, it became clear that this exception did not apply.

71. On January 9, 2020, Dr. Oliver attended a meeting with Assistant Athletic Director For Compliance and Academics, Ron Salvatore, and Mr. Swanson during which it was agreed that West Point would need to disclose to the NCAA its violations, spanning five years, with respect to the Strength Team.

72. On January 15, 2020, Mr. Buddie and Ms. Fowler met with Dr. Oliver. Mr. Buddie stated that Dr. Oliver had "difficulty with relationships" and that his contract and employment was being terminated without cause, effective January 30, 2020.

## FIRST CLAIM FOR RELIEF
(Retaliation in Violation of N.Y. Labor Law §740)

73.     Plaintiff repeats and re-alleges the allegations contained in the preceding

paragraphs above as if fully set forth herein.

74.     Defendant retaliated against Plaintiff for his opposition to, and disclosure to a

supervisor of, an activity, policy, or practice of Defendant that is in violation of a law, rule or

regulation which violation creates and presents a substantial and specific danger to the public

health or safety.

## SECOND CLAIM FOR RELIEF
(Retaliation in Violation of N.Y. Not-For-Profit Corporation Law §715-b(a))

75.     Plaintiff repeats and re-alleges the allegations contained in the preceding

paragraphs above as if fully set forth herein.

76.     Defendant retaliated against Plaintiff for reporting actions and suspected actions

taken by or within the corporation that are illegal, fraudulent or in violation of any adopted

policy of the corporation.

## THIRD CLAIM FOR RELIEF
(Retaliation in Violation of New York Executive Law §296(7))

77.     Plaintiff repeats and re-alleges the allegations contained in the preceding

paragraphs above as if fully set forth herein.

78.     Defendant terminated Plaintiff's employment in retaliation for Plaintiff's

opposition to Defendant's discrimination against West Point's female cadet-athletes.

## FOURTH CLAIM FOR RELIEF
(Breach of the Covenant of Good Faith and Fair Dealing)

79.     Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs above as if fully set forth herein.

80.      Under New York law, there is a covenant of good faith and fair dealing implied into every contractual relationship.

81.     Defendant breached the covenant of good faith and fair dealing implied in Plaintiff's  employment agreement by barring Plaintiff from the Kimsey Center, failing to provide him with access to injury data, and failing to deal with Mr. Kelly's insubordination. This prevented Plaintiff from performing some of his employment duties, eventually resulting in his termination.

82.     Defendant also breached the covenant of good faith and fair dealing when it terminated the employment agreement in retaliation for Plaintiff's efforts to perform the duties of his position by protecting the safety and well-being of West Point's cadet-athletes.

WHEREFORE, Plaintiff demands judgment:

1.     Reinstating Plaintiff's employment with Defendants and upon reinstatement, enjoining Defendant from retaliating against Plaintiff in violation of N.Y. Labor Law § in the terms and conditions of his employment;

2.     Awarding Plaintiff back pay;

3.     Awarding Plaintiff compensatory damages including damages for emotional distress;

4.     Awarding punitive damages;

5.     Awarding reasonable attorneys' fees, costs, and expenses, and

Granting such other relief to the Plaintiff as the Court may deem just and equitable.

## **JURY DEMAND**

Plaintiff demands trial by jury of all issues as of right by a jury.

Dated:      New York, New York
           August 26, 2020

                      GISKAN, SOLOTAROFF & ANDERSON LLP


                      s/
By:    Jason L. Solotaroff

           90 Broad Street, 10th Floor
           New York, New York 10004
           646-964-9640
           jsolotaroff@gslawny.com
           *ATTORNEYS FOR PLAINTIFF*